ORIGINAL

COURTESY COPY

Jeffrey L. Braun
Natan M. Hamerman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Tel. (212) 715-9100
Fax (212) 715-8000
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

904 TOWER APARTMENT LLC, et ano.,          :

                        Plaintiffs,          :          10 Civ. 9701 (LLS)

        - against -          :

THE MARK HOTEL LLC, et al.,          :

                      Defendants.          :          **NOTICE OF MOTION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLEASE TAKE NOTICE that, upon the Court's Opinion and Order dated

March 29, 2012 (a copy of which is annexed hereto), all of the papers submitted on defendants'

prior motion to dismiss the Second Amended Complaint in this action, and the accompanying

Memorandum of Law, the undersigned will move this Court before The Honorable Louis L.

Stanton, United States District Judge, at Courtroom 21C of the Daniel Patrick Moynihan United

States Courthouse, 500 Pearl Street, New York, New York 10007, in accordance with Local Rule

6.1, for an order granting defendants the following relief:

              (1)          amending the foregoing Opinion and Order to certify pursuant to

28 U.S.C. § 1292(b) that it involves a controlling question of law as to which there is

*Motion Denied.*
*So Ordered.*
*Louis L. Stanton 5/24/12*

KL3 2875144 1

substantial ground for difference of opinion and that an immediate appeal therefrom may

materially advance the ultimate termination of this action;

(2)    granting reargument and reconsideration of the foregoing Opinion

and Order to the extent that it denied defendants' prior motion to dismiss those

components of the Second Amended Complaint that are predicated upon alleged failures

to disclose (*i.e.*, the second, fourth, fifth and sixth causes of action and paragraphs 123

through 129 of the first cause of action); and

(3)    granting defendants such other and further relief as is just and

proper.

Dated:  New York, NY
        April 27, 2012

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP
                              Attorneys for Defendants


                              By      /s/      Jeffrey L. Braun_____
                                      Jeffrey L. Braun
                                      (jbraun@kramerlevin.com)
                                      Natan M. Hamerman
                                      (nhamerman@kramerlevin.com)

                              1177 Avenue of the Americas
                              New York, NY 10036
                              (212) 715-9100

To:    PHILLIPS NIZER LLP
       Attorneys for Plaintiffs
       Att'n   David A. Pellegrino, Esq.
               Carl D. LeSueur, Esq.
       666 Fifth Avenue
       New York, NY 10103

KL3 2875144.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
904 TOWER APARTMENT LLC and MADISON
APARTMENT 905 LLC,

                    Plaintiffs,                    10 Civ. 9701 (LLS)

          - against -                              **OPINION AND ORDER**

THE MARK HOTEL LLC, MARK HOTEL
SPONSOR LLC, THE MARK HOTEL OWNERS
CORP., ALEXICO GROUP, LTD., 205
EAST 45 LLC, SIMON ELIAS, IZAK
SENBAHAR and JOHN DOES 1-10

                    Defendants.
- - - - - - - - - - - - - - - - - -X

    Plaintiffs bring this action for breach of contract, fraud,

and related claims, alleging that defendants fraudulently

induced them to enter, and subsequently breached, agreements to

purchase two adjacent luxury apartments in a $750 million mixed

hotel and cooperative apartment development, resulting in

plaintiffs' loss of approximately $2.6 million in down payments.

    Defendants initially scheduled the closing for March 31,

2009, a date they postponed for two or three weeks. During that

time, defendants received a temporary certificate of occupancy

on April 13, and plaintiffs inspected the property on April 15,

before the rescheduled closing on April 16. The New York State

Attorney General intervened to obtain an adjournment of that

date by one week. Plaintiffs attempted to delay the closing

further, but never appeared at the closing, and never closed.

Plaintiffs allege non-performance of the agreements: defendants denied plaintiffs their right to adjourn the closing, and sought to force them to close on apartments which were uninhabitable. Plaintiffs also seek rescission on the grounds defendants overstated the demand for the apartments, failed to disclose material facts about the project's financing, and fraudulently induced the agreements. Defendants dispute the condition of the units, claim that any defects could be remedied after closing, and argue that plaintiffs disclaimed reliance on their representations and that their nondisclosures are immaterial.

Before filing this lawsuit, plaintiffs applied to the Attorney General for a return of their down payments under New York's Martin Act, N.Y. Gen. Bus. L. § 352-e, which requires that sponsors of cooperative offerings make certain disclosures and place down payments in escrow. The Attorney General issued a determination (the "Determination")[1] in favor of defendants, holding that plaintiffs "cannot rely on any such alleged defects as a basis for rescission if they have not given Seller notice and an opportunity to cure such defects," Determination ¶ 27, that "the identified defects in fact appear to be in the nature of what are typically regarded as punch-list items that a Seller

---

[1] Annexed as Exhibit 7 to defendants' declaration in support of the motion to dismiss.

- 2 -

may remedy <u>after</u> closing," <u>id.</u> ¶ 29 (emphasis in original), and that defendants' "obtaining of additional financing would not, even if included in an amendment submitted to and accepted for filing by the Attorney General, be a substantial amendment to the offering plan that adversely affects the purchasers" and gives a right to rescind under the Martin Act, because that financing was subordinated to the proposed co-operative leases, <u>id.</u> ¶ 18 (internal quotation marks omitted).   Plaintiffs are currently prosecuting an action in New York State court under Article 78 of the New York Civil Practice Law and Rules challenging the Determination.

Defendants move under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim.   For the reasons that follow, the motion is denied in part and granted in part.

## Background As Alleged in the Complaint[2]

Defendants Simon Elias and Izak Senbahar formed defendant corporation Mark Hotel LLC to convert a building on Manhattan's Upper East Side into a luxury, dual-use hotel and cooperative apartment complex.   Defendant Mark Hotel LLC leased the premises and conveyed one-third of that lease to defendant Mark Hotel Sponsor LLC ("Sponsor"), which constructed the apartments and offered them for public sale.   Sec. Am. Compl. ¶ 27.   Defendant

---

[2] Second Amended Complaint, dated March 3, 2011.

- 3 -

Alexico "is an affiliate of and has common ownership with Sponsor and Mark Hotel LLC," id. ¶ 16, and is "the manager of the Mark Hotel LLC and the Sponsor," id. ¶ 27.

Elias and Senbahar constructed the Mark and two other hotels (the Alex, developed by defendant 205 East 45 LLC, and the Flatotel) as a "unified enterprise," meaning the "three hotel projects were linked operationally, with, for example, a centralized accounting department, overlapping employee benefit plans and a practice . . . of using available cash for the most pressing needs of any one of the hotels and/or Elias' and Senhabar's related operations."   Id. ¶ 22 (internal quotation marks omitted).   Defendants Does 1-10 are "additional entities owned or controlled by Elias and Senbahar," which also operated as part of their 'unified enterprise.'"   Id. ¶ 21.

On January 11, 2008, Sponsor issued an offering plan (the "Offering Plan") detailing the cooperative construction project for the Mark Hotel.   On January 31, 2008, plaintiffs entered into two nearly identical contracts (together, the "Agreements," which incorporate the Offering Plan by reference) to purchase the two adjoining suites numbered 904 and 905 (the "Suites") for a total of $10,375,000.   Plaintiffs paid deposits on the properties totaling $2,593,750.

Construction of the Mark took longer than anticipated. Though the Offering Plan estimated that "work at the Building

- 4 -

will be sufficiently completed to permit closings of Suites to begin in or about May 2008," Offering Plan[3] at 117, construction remained incomplete even as the delayed April 16, 2009 closing date drew near.   Plaintiffs' April 15, 2009 inspection exposed a lack of basic amenities (e.g., "The Suites had no heat, and no hot water," "Only one of the three planned elevators was in operation, and it was the utility elevator, not a passenger elevator," id. ¶ 121), shoddy and incomplete construction (e.g., "there were no controls for the AC/Heating units," "there were gaps in floor joints," "bath accessories were not yet installed," "An excessively large gap between the wall and the ceiling in the master bathroom in Unit 904 would require reinstallation of the wall," id. ¶ 118), and aesthetic defects (e.g., "floor stain was applied messily and unacceptably uneven, baseboards were stained with floor stain," "entrance and interior doors were damaged and scratched," "The paint was unfinished in places or mismatched," id. ¶¶ 118-19).   "In short, instead of presenting construction consistent with a luxury turn-key home, Defendants presented construction indicative of a rush job performed to convey a façade of completeness."   Id. ¶ 120.

Nonetheless Sponsor "insisted that Plaintiffs close the next day," but "the Attorney General intervened and insisted

_____
[3] Excerpts of the Offering Plan are annexed as Exhibit 3 to defendants' moving papers.

that Defendants adjourn closing until April 23" 2009, which Sponsor did.  Id.  ¶¶ 106-107.  On April 20, 2009, plaintiffs sought to defer the April 23, 2009 closing to May 1, 2009 under a rider to the Agreements which provided them the right to adjourn "on one (1) occasion only." Agreements, Rider No. 1.[4] Sponsor refused, claiming that plaintiffs had already exercised that right because the Attorney General intervened at their behest.

Plaintiffs did not attend the April 23, 2009 closing. Sponsor declared them in default and informed them of their right to cure by closing instead on May 27, 2009.  After plaintiffs failed to appear for the May 27, 2009 closing, Sponsor terminated the Agreements and asserted a claim to retain the down payments as liquidated damages under Section 11(b) of the Agreements.

During the work of development of the Mark, defendants borrowed additional funds to finance the project, only some of which they disclosed to plaintiffs.  Before the execution of the Agreements, defendants "disclosed an acquisition loan and a predevelopment loan of $112,500,000 and $14,000,000, respectively." Sec. Am. Compl. ¶ 146.  However, defendants failed to disclose that they "borrowed additional funds for the

_____

[4] The Agreements are annexed as Exhibits A and B to plaintiffs' Application to the Attorney General, which is attached as Exhibit 2 to defendants' moving papers.

Mark Hotel through the Flatotel or the Alex Hotel", id. ¶ 145,
including "$7.5 million dollars from Anglo Irish" borrowed
"under a loan agreement for the Alex Hotel," id. ¶ 144, or that
they planned to use proceeds from the sale of the Mark
apartments to repay the "additional debt burden on the Alex,"
id. ¶ 146.

After the parties entered the Agreements, "Defendants
additionally disclosed a construction loan in an amount up to
$83,500,000, a building loan in an amount up to $60,780,200, a
project loan in an amount up to $22,719,800, and a mezzanine
loan in an amount up to $43,275,000," id. ¶ 186, but failed to
disclose that they "borrowed an additional $10 million from
Anglo Irish to fund the Mark Hotel renovation and development .
. . under a loan agreement for the Alex Hotel" in May 2008, id.
¶ 185, and that they "again borrowed an additional $10 million
for the Mark Hotel, this time obtaining financing through a loan
for the Flatotel" in November 2008, id. ¶ 188.  Moreover, they
failed to disclose that Mark Hotel LLC "entered into two
additional loans in the amounts of $6,349,711 and $17,055,280"
(together, the "New Mortgages") on April 1, 2009, two or three
weeks before the inspection and expected closing.  Id. ¶¶ 8,
124.

## Discussion

"When reviewing a motion to dismiss, a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw all inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### 1.

Defendants argue that the Determination precludes plaintiffs' claims under the doctrine of res judicata. Factfinding by a State agency has the same preclusive effect in federal courts that it would have in the courts of that State, subject to due process requirements and unless otherwise dictated by Congress. See Univ. of Tenn. v. Elliott, 478 U.S. 788, 789, 106 S. Ct. 3220, 3226 (1986) ("when a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be

entitled in the State's courts," unless Congress has directed
differently) (internal quotation marks omitted) (citation
omitted).

Under New York law, "It is well-settled that when the
common law gives a remedy, and another remedy is provided by
statute, the latter is cumulative, unless made exclusive by the
statute." Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt.
Inc., 18 N.Y.3d 341, 350-351 (2011) (internal quotation marks
omitted). Section 352-e(2-b) of the Martin Act, which
authorizes the Attorney General "to adopt, promulgate, amend
and rescind suitable rules and regulations . . . including,
but not limited to, determining when escrow funds may be
released," contains no language making its provisions exclusive.
As stated in the above case, "the plain text of the Martin Act,
while granting the Attorney General investigatory and
enforcement powers and prescribing various penalties, does not
expressly mention or otherwise contemplate the elimination of
common-law claims." Assured Guar., 18 N.Y.3d at 351.

Under such circumstances, courts must consider whether
application of res judicata "would be consistent with the
function of the administrative agency involved, the peculiar
necessities of the particular case, and the nature of the
precise power being exercised." Joosey v. Gourd, 9 N.Y.3d 386,
390, 880 N.E.2d 18, 21 (2007) (internal quotation marks

- 9 -

omitted). As stated in <u>Allied Chemical v. Niagara Mohawk Power Corp.</u>, 72 N.Y.2d 271, 277, 528 N.E.2d 153, 155 (1988) (citing cases),

> The court must look at the over-all context of the agency's decision to assess whether according a preclusive effect to a particular agency determination is consistent with the agency's scheme of administration; for example, the agency's need for flexibility, and its need to modify prior determinations in order to adapt its policy to changing conditions, may counsel against applying issue preclusion to a particular administrative decision.

The Attorney General's regulations governing disputes over deposits held in escrow provide:

> (viii) Disputes.
>
> (a) In the event of a dispute, the sponsor shall apply and the subscriber or purchaser or the escrow agent holding the down payments in escrow may apply to the Attorney General for a determination on the disposition of the down payment and any interest earned thereon. Forms for this purpose will be available from the Department of Law. The party applying shall contemporaneously send to all other parties a copy of such application.
>
> (b) Pending the determination of the Attorney General to grant or deny the application, the sponsor, the subscriber or purchaser and the escrow agent shall abide by any interim directive issued by the Attorney General.
>
> (c) If the application permitting release of funds is granted, the deposit and any interest earned thereon shall be disposed of in accordance with the determination of the Attorney General, subject to any court action in which preliminary relief is granted.
>
> (d) The Attorney General shall act upon the application within 30 days after its submission to the

- 10 -

Department of Law, by either making a determination or
notifying the parties that an extension of time in
which to do so is necessary for stated reasons.

(e) If the application seeking release of funds is
denied, the escrow agent shall continue to hold the
deposit and any interest earned thereon until:

(1) both the sponsor and subscriber or purchaser
direct payment to a specified party in accordance
with a written direction signed by both the
sponsor and subscriber or purchaser; or

(2) a judgment or order of a court of competent
jurisdiction is served on the escrow agent; or

(3) the escrow agent deposits the disputed amount
into court.

13 NYCRR § 21.3(l)(3)(viii)(a)-(e).

None of the above regulations provides for any preclusive
effect over any court of the State exercising its jurisdiction
over the deposit, if appropriately invoked.   On the contrary,
the rules contemplate the utility of court action at appropriate
junctures   (such   as   granting   preliminary   relief,   entering
judgment to be served on the escrow agent, or receiving deposit
of disputed amounts in court) as part of the court's normal
function   of   managing   and   adjudicating   contract,   tort   and
statutory cases.

The   common   sense   of   those   regulations   is   illustrated   in
this case.   Defendants say that the Attorney General's order
concerning the deposit rests on the condition of the apartment
at the time (i.e., a temporary certificate of occupancy was

- 11 -

issued), and argue that the Attorney General's finding that its condition was habitable binds all other issues in the disputed litigation.  But the scope of plaintiffs' case is wider.  Proof of fraudulent inducement into the purchase contracts would give a right of rescission regardless of the condition of the apartment when tendered.  The Attorney General's determination was too narrow, and rested on too slight a base to serve to adjudicate the tort and contract arguments involved between these parties, or to foreclose the issues in this litigation.

Cases such as this demonstrate the pragmatism of the regulation (13 NYCRR § 21.3(l)(3)(viii)(e)(1)-(3)) that the escrow agent retain the deposit until the matter is settled, a judgment or order of a court of competent jurisdiction is served on the escrow agent, or the amount is deposited into court.

Thus, the function and the regulations of the New York Attorney General with respect to the disposition of deposits do not exclude, but rather anticipate and accommodate judicial determinations as to matters within the courts' traditional jurisdiction.  So much of the motion as seeks to bar plaintiff's claims for res judicata is denied.

2.

Defendants argue that the Martin Act preempts plaintiffs' claims for breach of contract, fraud, specific performance and

- 12 -

negligent misrepresentation because those claims "are based in whole or in large part upon the alleged omission of information from the Offering Plan." Def. Mem. at 20.   The argument rests in major part on Kerusa Co. v. W10Z/515 Real Estate Ltd. Partnership, 12 N.Y.3d 236, 906 N.E.2d 1049 (2009), in which the New York Court of Appeals held

> . . . that a purchaser of a condominium apartment may not bring a claim for common-law fraud against the building's sponsor when the fraud is predicated solely on alleged material omissions from the offering plan amendments mandated by the Martin Act (General Business Law art 23-A) and the Attorney General's implementing regulations (13 NYCRR part 20).

12 N.Y.3d at 239, 906 N.E.2d at 1050.   The Court reasoned that at common law there had been no duty for a seller to disclose anything about the premises, as long as there was not active concealment, id. at 245, 906 N.E.2d at 1054; that the Martin Act required such disclosures but did not provide a private right of action; and that to allow a private suit based on omissions in the required disclosures would "invite a backdoor private cause of action to enforce the Martin Act," id.   The Court stated:

> The question on this appeal is whether Kerusa has any common-law claim for fraud, as distinct from a claim under the Martin Act, which only the Attorney-General may bring.   We conclude that Kerusa has no such claim.
>
> Kerusa alleges in its proposed second amended complaint that the sponsor defendants did not disclose various construction and design defects in the offering plan amendments, and represented therein that there were no 'material changes of facts or

circumstances affecting the property or the offering'
(see 13 NYCRR 20.5(a)(2)) when, in fact, problems
arising during construction alerted them to the
existence of major defects, which they either ignored
or inadequately remedied.  But for the Martin Act and
the   Attorney   General's   implementing   regulations,
however, the sponsor defendants did not have to make
the disclosures in the amendments.   Thus, to accept
Kerusa's pleading as valid would invite a backdoor
private cause of action to enforce the Martin Act in
contradiction to our holding in CPC Intl. that no
private right to enforce that statute exists.   It
would, as amicus Real Estate Board of New York points
out,  'expand   the   already   detailed   disclosure
requirements of the Martin Act by forcing parties to
disclose the normal kinds of problems [encountered] in
the course of construction that are described in field
reports, project meetings and change orders' in order
to   avoid   transforming   every   potential   latent
construction defect case into a claim for common-law
fraud on account of alleged omissions in Martin Act
disclosures.

Id. (brackets in original).

       However, it is now clear that in cases of mere overlap

between the facts upon which civil claims of fraud and deception

are based, and the facts required to be disclosed by the Martin

Act, the "Martin Act 'does not pre-empt the prosecution of

private common law claims' including breach of contract, 'fraud,

misrepresentation or negligence independent of the duty imposed

under the Martin Act.'"  Anwar v. Fairfield Greenwich Ltd., 728

F.Supp. 2d 354, 361 (S.D.N.Y. 2010),[5] quoting Bridge Street

Homeowners Assoc. v. Brick Condo. Developers, LLC, No. 26507/06,

856 N.Y.S.2d 496 (Table), 2008 WL 344136, at *1 (N.Y. Sup. Ct.

---

[5] This opinion contains an exhaustive review of Martin Act preemption cases.

Feb. 7, 2008).  While this present motion was pending, the New York Court of Appeals in Assured Guaranty, 18 N.Y.3d at 352-54 (2011) (brackets in original), held:

> In Kerusa, we recently examined whether the purchaser of a condominium apartment could institute a cause of action for common-law fraud 'predicated solely on alleged material omissions from the offering plan amendments mandated by the Martin Act . . . and the Attorney General's implementing regulations' (12 NY3d at 239).  According to the complaint in Kerusa, the defendants — the sponsor of the condominium and other related parties — had failed to 'disclose various construction and design defects in the offering plan amendments' filed with the Attorney General pursuant to the Martin Act (id. at 245).  We were careful to make clear that '[b]ut for the Martin Act and the Attorney General's implementing regulations, however, the sponsor defendants did not have to make the disclosures in the amendments' (id.).  Put differently, the purchaser's entire claim was premised on a violation of the Martin Act and would not have existed absent the statute.  Under these discrete circumstances, we held that the purchaser could not bring a fraud claim because to accept the 'pleading as valid would invite a backdoor private cause of action to enforce the Martin Act in contradiction to our holding in CPC Intl. that no private right to enforce that statute exists' (id.).

> Read together, CPC Intl. and Kerusa stand for the proposition that a private litigant may not pursue a common-law cause of action where the claim is predicated solely on a violation of the Martin Act or its implementing regulations and would not exist but for the statute. But, an injured investor may bring a common-law claim (for fraud or otherwise) that is not entirely dependent on the Martin Act for its viability.  Mere overlap between the common law and the Martin Act is not enough to extinguish common-law remedies.

> Finally, J.P. Morgan claims that policy considerations, including the preservation of the Attorney General's exclusive enforcement authority

- 15 -

under the Martin Act, should encourage us to find
expansive preemption in the securities and real estate
fields.   To the contrary, we believe that policy
concerns militate in favor of allowing plaintiff's
common-law claims to proceed.   We agree with the
Attorney General that the purpose of the Martin Act is
not impaired by private common-law actions that have a
legal basis independent of the statute because
proceedings by the Attorney General and private
actions further the same goal—combating fraud and
deception in securities transactions.   Moreover, as
Judge Marrero observed recently, to hold that the
Martin Act precludes properly pleaded common-law
actions would leave the marketplace 'less protected
than it was before the Martin[ ] Act['s] passage,
which can hardly have been the goal of its drafters'
(Anwar v. Fairfield Greenwich Ltd., 728 F Supp 2d 354,
371 [SD NY 2010]).

For all of these reasons, we conclude that plaintiff's
breach of fiduciary duty and gross negligence claims
are not barred by the Martin Act.

Thus, to accept plaintiffs' pleadings would not "invite a

backdoor private cause of action to enforce the Martin Act,"

Kerusa, 12 N.Y.3d at 245, 906 N.E.2d at 1054, and the Act does

not inhibit the bringing of this litigation.   So much of the

motion as seeks to bar plaintiff's claims as preempted under the

Martin Act is denied.

3.


### Count One: Breach of Contract

"To state a claim in federal court for breach of contract

under New York law, a complaint need only allege (1) the

existence of an agreement, (2) adequate performance of the

- 16 -

contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). Plaintiffs allege that Sponsor breached the Agreements by failing to deliver the Suites in habitable condition, scheduling the closing date in bad faith, failing to provide plaintiffs a right to rescind based on material adverse changes to the project, and failing to disclose material facts about the Mark's financing.

**Condition of the Suites**

Plaintiffs allege that Sponsor breached Section 16 of the Agreements by requiring "Plaintiffs to close although the Hotel was unfinished, unoccupied, and uninhabitable." Sec. Am. Compl. ¶ 117. Defendants argue that when they obtained the temporary certificate of occupancy, the Suites became presumptively fully completed under Section 16.1 of the Agreements, which provides that

> The issuance of a temporary or permanent Certificate of Occupancy for the Suite shall be deemed presumptive evidence that the Coop Property and Suite have been fully completed in accordance with the Plan and the Plans and Specifications. However, nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Plan in the Section entitled "Rights and Obligations of Sponsor."[6]

---

[6] Section X, entitled "Obligations of Sponsor," of Part I of the Offering Plan provides that

> Sponsor or its representatives will correct, repair or replace all defects in the construction of the Coop Property and its appurtenances and the Suites offered hereby . . . if . . .

- 17 -

In a closely similar case in this Court, Judge Pauley
pointed out that notwithstanding similar language in
Section 16.3, under the Agreements, "Sponsor did not intend
to sell, and Campbell did not intend to close on, a Suite
which was uninhabitable." Campbell v. Mark Hotel Sponsor,
LLC, No. 09 Civ. 9644 (WHP), 2010 WL 3466020, at *5.   He
was referring to Section 16.3 of the Agreements, which
obliges plaintiffs to

> . . . close and complete payment of the full Purchase
> Price (without any credit against or abatement in the
> Purchase Price and without any provision for escrow)
> once a temporary or permanent Certificate of Occupancy
> is issued for the Suite (notwithstanding any
> construction items noted on Purchaser's Inspection
> Statement (as hereinafter defined) remaining for
> Sponsor to complete and/or correct in accordance with
> its obligations under the Plan, and notwithstanding
> the incomplete construction and/or decoration of any
> other portions of the Building not preventing
> Purchaser's occupancy of the Suite).

(emphasis added).  Of that language, Judge Pauley held:

> Although Section 16.3 of the Purchase Agreement
> clearly states that 'Purchaser shall be obligated to
> close . . . once a . . . Certificate of Occupancy is
> issued,' that section contains an important proviso
> that incomplete construction in The Mark Hotel must
> 'not prevent[ ] Purchaser's occupancy of the Suite.'

Campbell, 2010 WL 3466020, at *5 (brackets in original).

---

> Sponsor is notified by the Board or the affected Shareholder in
> writing of such defect: (i) as to the Common Areas, within one
> year from the earlier of the issuance of a temporary Certificate
> of Occupancy . . . or (ii) as to any Suite, on or prior to the
> date of closing for such Suite . . . .

Offering Plan at 119.

- 18 -

The alleged defects support a plausible inference that the
Suites were uninhabitable: the Suites, which are on the ninth
floor, had limited elevator access, see id. ("it is plainly
unreasonable to assert that an apartment on the fourteenth floor
of a building undergoing significant renovations is usable when
it is not reliably accessible by an elevator"), and lacked heat
and hot water, and ventilation system controls, see id. ("the
alleged lack of heating, ventilation, hot water, garbage
disposal, and secured entrances suggests that the Suite did not
meet minimum standards for habitability").

Defendants argue that plaintiffs cannot prevail on a claim
for breach based on the conditions of the Suites because
plaintiffs never attended a closing.  Though a purchaser of real
property who does not attend a closing generally forfeits his
down payment, an exception lies where the purchaser has a lawful
excuse.  See Cipriano v. Glen Cove Lodge No. 1458, 1 N.Y.3d 53,
63, 801 N.E.2d 388, 395 (2003) ("Because the Lodge was in
material breach of its contractual obligations to Cipriano, we
conclude that Cipriano had a lawful excuse for his failure to
appear on the January 28 closing date.").  Plaintiffs have
sufficiently pled such an excuse on the basis of the alleged
condition of the Suites at the time of the inspection.  See
Campbell, 2010 WL 3466020, at *4 (denying Sponsor's motion to
dismiss though purchaser never attended a closing); Asensio v.

- 19 -

<u>Casa 74th Dev., LLC</u>, 79 A.D.3d 588, 588, 913 N.Y.S.2d 96, 96 (App. Div. 2010) ("Defendant sponsor's failure to substantially complete the work would have constituted a breach of the agreement to sell the unit and relieved plaintiff of his duty to attend the closing and tender the balance of the purchase price.").

**Scheduling the Closing**

Plaintiffs complain that Sponsor scheduled the March 31, 2009 closing "without any intent to close on that date," Sec. Am. Compl. ¶ 102, and subsequently adjourned the closing without reasonable notice "to interfere with the Plaintiffs' right to an inspection and thwart any inspection," <u>id.</u> ¶ 115. Plaintiffs further allege that Sponsor rejected their attempt to adjourn the closing in "direct violation of the Plaintiffs' rights to adjourn the closing under Section 5 of the Purchase Agreements, as amended." <u>Id.</u> ¶ 108.

The complaint also says the plaintiffs "withstood the Defendants' pressure to close," <u>id.</u> ¶ 11, and it is not clear what, if any, injury plaintiffs sustained from these scheduling differences. Their determinative claim is that the Suites were unfit for occupancy when Sponsor wanted to close, and they did conduct an inspection, which exposed sufficient defects in the construction to pose the major issue in this litigation. Whether or not they furnish an independent breach of the

- 20 -

Agreements, these scheduling allegations will almost certainly be admissible at trial to show the parties' motivations and course of dealing, which are not susceptible of resolution by motion to dismiss.

### Count Two: Fraudulent Inducement

To state a claim of fraud under New York law, a plaintiff must establish "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Plaintiffs allege that their principal "was told by a man acting as Defendants' sales agent at the showroom that other apartments were not available because they 'sold out,'" Sec. Am. Compl. ¶ 133, even though "Defendants have never obtained more than seven signed purchase agreements for any of the Suites, and only two purchasers closed on their units," id. ¶ 135.

Plaintiffs cannot plead justifiable reliance on that statement, because they specifically disclaimed it in Section 19

- 21 -

of the Agreements, which provides that

> Purchaser acknowledges that Purchaser has not relied
> upon any architect's plans, sales plans, selling
> brochures, advertisements, representations,
> warranties, statements or estimates of any nature
> whatsoever, whether written or oral, made by Sponsor,
> the Cooperative Corporation, Selling Agent or
> otherwise, including, but not limited to, . . . the
> services to be provided to Shareholders, the estimated
> Maintenance Charges allocable to the Suite, the
> estimated real estate taxes of the Suite, the ability
> to rent the Suite . . . or any other data, except as
> herein or in the Plan specifically represented;
> Purchaser has relied solely on his or her own judgment
> and investigation in deciding to enter into this
> Agreement and purchase the Suite.

Such a disclaimer "destroys the allegations in plaintiff's
complaint that the agreement was executed in reliance upon these
contrary oral representations." Dannan Realty Corp. v. Harris,
5 N.Y.2d 317, 320-321, 157 N.E.2d 597, 599 (1959); see also
Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 576
(2d Cir. 2005) (applying New York law). Though a disclaimer
will not be given effect "when the facts are peculiarly within
the knowledge of the party invoking" it, Aetna, 404 F.3d at 576
(citations omitted), plaintiffs do not allege that sales
information regarding other suites was private or otherwise
undiscoverable by minimal investigation. Rather, they merely
allege, in conclusory fashion, that "Defendants knew that they
possessed superior knowledge to the Purchasers regarding to the
lackluster sales of the Suites." Sec. Am. Compl. ¶ 151.

Plaintiffs also claim that Sponsor's failure to disclose

facts relating to the Mark's finances induced them to enter the
Agreements.  Under New York law, a party has a duty to disclose
material facts "where one party possesses superior knowledge,
not readily available to the other, and knows that the other is
acting on the basis of mistaken knowledge."  Lerner v. Fleet
Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006).

   Plaintiffs allege that defendants failed to disclose that
they "borrowed additional funds for the Mark Hotel through the
Flatotel or Alex Hotel," id. ¶ 145, including $7.5 million
borrowed "specifically for operation of the Mark Hotel" "under a
loan agreement for the Alex Hotel," id. ¶ 144, and that "they
were operating the Mark Hotel as part of one entity with the
Alex Hotel and the Flatotel, which had millions of dollars in
additional undisclosed debt," id.  Plaintiffs further allege
that because Sponsor failed to disclose the New Mortgages and
additional debt obtained through the Alex and Flatotel after the
parties entered the Agreements, plaintiffs "stopped looking for
alternative living arrangements, performed their other
obligations under the Purchase Agreements, and hired consultants
to help perform the pre-closing inspection."  Id. ¶ 154.

   These allegations support a plausible inference that at the
time the parties entered the Agreements, Sponsor knew plaintiffs
were operating under the mistaken belief that the project was
financed only by the acquisition and predevelopment loans:

Sponsor disclosed those loans in the Offering Plan, a document it prepared. Id. ¶¶ 126, 142.

A jury might find that plaintiffs justifiably relied on that mistaken belief, and that Sponsor's omissions were material given the importance of the successful operation of the hotel to the value of the Suites and the living experience marketed to plaintiffs.   Thus, defendants' motion to dismiss plaintiffs' action for fraudulent inducement is denied.

### Count Three: Unjust Enrichment

Plaintiffs' claim for unjust enrichment is dismissed because the Agreements govern the relationship between the parties. Cox v. NAP Constr. Co., 10 N.Y.3d 592, 607, 891 N.E.2d 271, 278 (2008) ("a party may not recover in quantum meruit or unjust enrichment where the parties have entered into a contract that governs the subject matter.").

### Count Six: Negligent Misrepresentation

The elements of a claim for negligent misrepresentation under New York law are "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect [or withheld]; and (3) reasonable reliance on the information [or omission]." High Tides, LLC v. DeMichele, 88 A.D.3d 954, 959, 931 N.Y.S.2d 377, 382 (App. Div.

- 24 -

2011) (internal quotation marks omitted) (brackets in original).

Though plaintiffs cannot plead reliance on the alleged misrepresentation of Sponsor's sales agent, they adequately state a claim for negligence based on Sponsor's partial disclosure of the Mark's liabilities, and failure to disclose the Mark's financial relationship to the Alex and Flatotel. See pp. 18-22, supra.

**Count Seven: Violation of New York's Deceptive Practices Act**

Plaintiffs' claim for violation of New York's Deceptive Practices Act, N.Y. Gen. Bus. L. § 349, is dismissed because they do not adequately allege that defendants' conduct was consumer oriented. See N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) ("parties claiming the benefit of the section must, at the threshold, charge conduct that is consumer oriented"). To determine whether deceptive practices are consumer oriented, courts examine whether the transaction is more like "[t]he typical violation contemplated by the statute," which "involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising," than "large, private, single-shot contractual transactions," which involve "complex arrangements, knowledgeable and experienced parties and large sums of money."

Teller v. Bill Hayes, Ltd., 213 A.D.2d 141, 146-48, 630 N.Y.S.2d 769, 773-774 (App. Div. 1995).   A transaction over $10 million in real estate, about which the alleged deceptive practices sound primarily in breach of, and fraudulent inducement into, contracts negotiated by counsel, is too unlike a typical consumer violation to be covered under the statute.

### Alter Ego Liability of Defendants Other Than Sponsor

Plaintiffs adequately allege alter ego liability against all defendants because defendants Elias and Senbahar used Sponsor "to pursue their own ends" and operated the defendant corporations as "one whole entity."   Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991) (applying New York law).   Plaintiffs allege that Elias and Senbahar either own or are "principals and controlling members of" Sponsor and all other corporate defendants, used "available cash for the most pressing needs of any one of the hotels and/or Elias' and Senbahar's related operations," Sec. Am. Compl. ¶ 22, used loans provided to the Alex and Flatotel to fund the Mark, used common office space and employees to run the Mark, Alex and Flatotel, and generally operated all of their affiliates as a unified enterprise.   Those allegations speak to "the absence of the formalities and paraphernalia that are part and parcel of the corporate existence," "overlap in ownership, officers,

- 26 -

directors and personnel," "common office space," "comingling of assets," and "the payment or guarantee of debts of the dominated corporation by other corporations in the group," all of which are factors a jury may apply "to the infinite variety of situations that might warrant disregarding the corporate form" in order to decide whether "the policy behind the presumption of corporate independence and limited shareholder liability - encouragement of business development - is outweighed by the policy justifying disregarding the corporate form - the need to protect those who deal with the corporation." Wm. Passalacqua Builders, 933 F.2d at 139. Dismissal of any of the named defendants is thus inappropriate at this juncture.

<h2 align="center">Conclusion</h2>

Defendants' motion to dismiss the Second Amended Complaint is granted in part and denied in part. The motion to dismiss is granted with respect to counts three (unjust enrichment) and seven (violation of the Deceptive Practices Act). The motion is denied with respect to counts one (breach of contract), two (fraudulent inducement), four (specific performance), five (fraud before the Attorney General), and six (negligent misrepresentation). Plaintiffs have leave to replead within 60 days.

Dated: New York, New York
      March 29, 2012

LOUIS L. STANTON
U.S.D.J.